FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA SEP 27 AM 9:33
SOUTHERN DIVISION

U.S. DISTRICT COURT
N.D. OF ALABAMA

RONALD SMITH,                        )
                                     )
            Plaintiff                )
                                     )
vs.                                  )        CASE NO. CV99-HGD-2241-S
                                     )
UNITED STATES OF AMERICA,            )
                                     )
            Defendant                )

**ENTERED**

SEP 27 2002

## MEMORANDUM OPINION

The above-entitled civil action is before the undersigned magistrate
judge, based on the consent of the parties to the exercise of jurisdiction by the
undersigned pursuant to 28 U.S.C. § 636(c), LR 72.1, and Rule 73, Fed.R.Civ.P.
On September 17 and 18, 2002, the case was tried without a jury with respect
to all issues.

On August 26, 1999, plaintiff, Ronald Smith, filed the complaint in this
action based on the January 22, 1999, motor vehicle accident involving plaintiff
and Ronald Johnson.  At the time of the accident, Ronald Johnson was operating
a United States Postal Service (USPS) truck and acting in the line and scope of
his employment with the USPS; therefore, the correct defendant is the United
States of America.   Plaintiff alleges in his complaint that Johnson acted
negligently or wantonly, and that such negligence or wantonness caused

plaintiff to suffer a broken hip and broken femur, with resulting permanent disability, and caused plaintiff's vehicle to be totally destroyed. Defendant, in its answer, denied that Ronald Johnson was negligent or wanton and also averred that any recovery by plaintiff was barred by plaintiff's contributory negligence.

The testimony presented at trial and the exhibits submitted by the parties are summarized as follows.

In the early 1980s, plaintiff sustained a gunshot wound to his right leg. To repair the damage, a rod and plate were placed in plaintiff's right thigh to hold the bone together. Plaintiff was disabled for a period of time as a result of this incident. He applied for and received Social Security disability benefits for his physical disability from the gunshot wound and due to substance abuse of alcohol and illegal drugs. When the regulations governing Social Security disability benefits were amended, plaintiff's disability benefits based on substance abuse ceased. His disability benefits were completely discontinued in 1996. Plaintiff admitted he previously was convicted in the Circuit Court of Jefferson County of breaking and entering a vehicle.

At the time of the January 22, 1999, accident, plaintiff worked as a "lumper," unloading trucks on a per-load contract basis. He had been working as a lumper for about two and a half years prior to the accident. According to plaintiff, he had been making approximately $500 to $600 a week. He worked

2

primarily for Associated Groceries. On January 21, 1999, plaintiff had consumed about a case of beer. He also had washed and cleaned the inside of his car, a 1984 Chrysler Fifth Avenue.

Plaintiff's witness Anthony Walter worked for the Chicago Police Department for approximately one year, in 1987, after being trained at the police academy. He was injured in the line of duty and, therefore, retired. He moved to Alabama in 1988 to live with his father while he recuperated from his injuries. Since that time, Mr. Walter has worked as a security guard, most recently for Associated Groceries. Associated Groceries' policy prohibits its employees and lumpers from being under the influence of alcohol or drugs while at work, or from consuming alcohol or drugs while at work. Mr. Walter's duties at Associated Groceries included ensuring that lumpers did not come to work while under the influence of alcohol or drugs and did not consume alcohol or drugs while at work. Mr. Walter became acquainted with plaintiff approximately two to three years prior to 1999 as a result of his job with Associated Groceries. However, he did not know plaintiff well and did not socialize with him. He did not see plaintiff under the influence of alcohol or drugs at work.

On Friday, January 22, 1999, plaintiff had worked until sometime in the late afternoon or early evening at Associated Groceries. Thereafter, he went to the home of Alberta Haywood to see Mrs. Haywood's son, his long-time friend. Mrs. Haywood testified that plaintiff was already at her house when she

3

got off work at approximately 5:00 p.m. Mrs. Haywood testified that she and plaintiff left the house at about 6:30 or 6:45 p.m. to take Mrs. Haywood to a friend's house, arriving at the location about 30 minutes later. Plaintiff testified that he did not leave work until approximately 8 p.m.; therefore, Mrs. Haywood must have been mistaken about the time. Mrs. Haywood stated she did not see plaintiff consume any alcohol, and plaintiff testified that he had nothing to drink while at the Haywood residence. Mrs. Haywood and plaintiff stated that the inside of plaintiff's car was clean, because plaintiff had washed it the day before, and there were no beer cans or liquor bottles in the car at that time. Plaintiff was supposed to be going to his brother's house after dropping off Mrs. Haywood. Mrs. Haywood testified that she was aware that plaintiff, plaintiff's brother, and her son all drink alcohol.

Plaintiff testified in his deposition that his plans for the evening of January 22, 1999, were to visit a young lady who lived at Metropolitan Gardens. [DX #50].[1] At trial, he testified that he also was to pick up his daughter, who lived at Metropolitan Gardens with his wife, for a weekend visit. According to plaintiff, if his wife smelled alcohol on his breath, she would not allow him to get their daughter for visitation. He also testified that he wanted to make a good impression on the young lady he was visiting; therefore, he abstained from alcohol prior to his visit. On the way to Metropolitan Gardens in Birmingham

_____

[1] Citations in this opinion to plaintiff's trial exhibits will be in the form "PX #__" and citations to defendant's trial exhibits will be in the form "DX #__".

4

from his home at 114 77th Street North, plaintiff was driving west on 1st Avenue North. He stopped at a convenience store to buy a can of beer. On the night of January 22, 1999, it was raining heavily, and visibility was bad. Plaintiff testified in his deposition that it was also thundering and lightning.

On January 22, 1999, Ronald Johnson was working for the United States Postal Service as a truck driver. He had been so employed since 1987. His duties included driving nine-ton mail trucks on the afternoon to evening shift. He was experienced in driving the nine-ton mail trucks at night and in rain and snow. The nine-ton mail trucks have reflective decals on the front, sides and back of the cargo portion. [See DX #20, 21 and 22 for photographs of typical nine-ton mail truck in daylight; see DX #23, 24 and 25 for photographs of typical nine-ton mail truck at night]. The trucks also have lights along the top front of the cab. The nine-ton mail trucks are approximately 27½ feet long and weigh approximately 15,000 pounds. [DX #19]. When fully loaded, at about 80% capacity, the trucks weigh approximately 25,000 to 27,000 pounds. At the time of the accident, Ronald Johnson's mail truck, a 1991 Ford nine-ton postal truck, was fully loaded and had all reflective decals in place and all lights working. [See DX #26, 27 and 28 for photographs of truck involved in accident showing where decals were located prior to removal after accident].

In 1999, Mr. Johnson usually went from the Post Office Annex on 1st Avenue South to the airport at about 10 p.m. There was little lighting from the

5

Annex to 43rd Street; on 1st Avenue North, there were some streetlights on the left side of the road if traveling east, in the direction of Woodlawn.  Due to the paucity of lights, Mr. Johnson stated he drove with his headlights on because he would not be able to see otherwise.

On the way from the Annex on 1st Avenue South on January 22, 1999, Mr. Johnson recalled that he drove south on 1st Avenue South, took a right onto 43rd Street, took a right onto 1st Avenue North and proceeded north (east) on 1st Avenue North to 45th Place North, where he was going to take a left. [See DX #29, videotape taken from cab of nine-ton USPS truck proceeding from Annex to collision intersection at night].  The weather was rainy, with perhaps some snow mixed into the rain, but he testified that there was no thunder or lightning.  Mr. Johnson was not under the influence of drugs or alcohol at the time of the accident.

Just prior to the accident, Ronald Johnson was stopped on 1st Avenue North, facing east, preparing to take a left turn onto 45th Place North.  At that intersection, there is a streetlight on the side of the road where 45th Place North meets 1st Avenue North.  Therefore, the streetlight would have been directly over the cargo portion of the mail truck.  There is no traffic light at the intersection of 1st Avenue North and 45th Place North.  First Avenue North has a total of five lanes: two east bound lanes, two west bound lanes, and one center turn lane.  The speed limit is 40 m.p.h. [See PX #41 through 52 and DX

6

#3 through 10 for photographs of the area of the collision in daylight; see DX #11 through 16 for photographs of the area of the collision at night].

Willie Harris, a USPS employee, drives a mail truck for the USPS.  On January 22, 1999, he was working the 2:30 to 11:30 p.m. shift, taking mail from the USPS Annex on 41st Street to the airport.  He was driving a Ryder truck rented by the USPS and was stopped at the stop sign on 45th Place as it intersects with 1st Avenue North.  He saw Ronald Johnson stopped on 1st Avenue North at 45th Place North, in the turn lane.  He saw that the headlights of Mr. Johnson's truck were on.  Mr. Harris never saw plaintiff's car on 1st Avenue North prior to the collision.  He looked away briefly from the road, and when he looked up again, he did not see Mr. Johnson in the same place.  He did not see the collision itself.  [See PX #1, Statement of Willie Harris provided to Roland Fleming]

As plaintiff proceeded west on 1st Avenue North toward Birmingham, he approached the intersection of 1st Avenue North and 45th Place North.  He was in the right hand lane, next to the curb.  In his deposition, plaintiff averred that all the streetlights on 1st Avenue North were out; the only light was the traffic signal at the intersection with 45th Place North.  He testified that he did not see Ronald Johnson's truck or any headlights or turn signal indicator.  He also testified that he was concentrating on the traffic light at the intersection of 1st Avenue North and 45th Place to make sure it was green for him.  Plaintiff

7

testified in his deposition that he was going up to 35 m.p.h. while traveling on 1st Avenue North.  He testified at trial that he was traveling 25 to 30 m.p.h. He denied that he had drunk any alcohol on January 22, 1999.

Plaintiff testified that just as he approached the intersection of 1st Avenue North and 45th Place North, he saw something dark pass in front of him.  He did not see any reflective decals.  It was the mail truck driven by Ronald Johnson, turning left onto 45th Place North.  Plaintiff's car collided with the side of the truck, and the front of plaintiff's car wedged under the side of the truck's cargo compartment.  The front of the car collided with the truck just behind the cab and continued along the side before coming to rest.  Plaintiff stated he was knocked out momentarily, then he pushed the door of the car open to get out. He was bleeding from his head and had glass in his mouth.  He used his arms to drag himself out and away from the car because he could not move his right leg.

Ronald Johnson testified that he pulled into the turn lane of 1st Avenue North approximately 1/8 of a mile before the intersection of 1st Avenue North and 45th Place.  He activated his left turn signal.  He saw the Ryder truck driven by Willie Harris stopped at the stop sign on 45th Place North; he thought the truck was the one driven by Mr. Harris.  Mr. Johnson testified that he looked for oncoming traffic, but he did not see any cars or headlights.  He also looked in his rear view mirror but did not see any headlights behind him.   He

8

proceeded to make a left turn from 1st Avenue North onto 45th Place North. When most of the cab of the truck was into 45th Place North, he felt a collision which pushed the truck back into 1st Avenue North. He never saw a vehicle coming toward him prior to the collision.

Anthony Walter testified that on the night of January 22, 1999, he got off work at 11 p.m. and was proceeding east on 1st Avenue North in the left hand lane toward Woodlawn. He testified it was raining heavily, thundering and lightning. As he approached the intersection of 1st Avenue North and 45th Place North, he saw only one vehicle in the opposite lanes, traveling west in the right hand lane, with its headlights on. He estimated the car's speed to be 25 m.p.h. He also testified that there is a traffic light at the intersection of 1st Avenue North and 45th Place North, and that light was green for him. He also did not recall any streetlights at the corner of 1st Avenue North and 45th Place. When shown photographs of the intersection of 1st Avenue North and 45th Place [DX #6, 7], he could not explain why he testified that there was a traffic signal at the intersection and that there was no streetlight.

Mr. Walter testified he saw the vehicle coming toward him, then he did not see the lights any more. He slowed his car because he could no longer see the oncoming car, then he heard a boom. At that point, he then saw the mail truck being driven by Ronald Johnson with plaintiff's car partially under it, but he testified that the truck's lights were not on. Mr. Walter testified that had the

9

truck not turned in front of plaintiff's car, Mr. Walter would have run into the back of it because the truck had no lights and no reflectors. However, when he lost sight of the lights of the oncoming car, he moved from the left hand lane to the right hand lane. When shown a photograph at trial of a mail truck with reflectors at night [DX #25], Mr. Walter was unable to give an explanation for his failure to notice the truck driven by Mr. Johnson on the night of January 22, 1999. Mr. Walter immediately stopped his car to see if he could help. After the collision, plaintiff was partially outside his vehicle.

Mr. Harris went to plaintiff's car to see if he could assist. Mr. Walter arrived very soon thereafter. Plaintiff was partially out of his car, and Mr. Harris was attempting to move plaintiff completely out of the car. Mr. Walter stopped Mr. Harris, to ensure plaintiff was not injured in getting him out of the vehicle. Mr. Walter testified that he looked in the front seat of the car and saw that plaintiff's leg was trapped by the steering wheel, so he extricated plaintiff from the car. Plaintiff was shouting and asking Mr. Harris and Mr. Walter to help him. Both Mr. Harris and Mr. Walter testified that plaintiff did not smell of alcohol. However, Mr. Harris testified that he smelled alcohol in plaintiff's car but did not observe any bottles or cans. Mr. Walter denied seeing any bottles or cans in the car or on the street and denied smelling alcohol in the car. Mr. Walter observed a deep gash in the middle of plaintiff's forehead, glass in his mouth and nose, and cuts on his face. [See PX #31 and 32 for photographs of

10

plaintiff in hospital, depicting head injury].  Mr. Harris and Mr. Walter stayed with plaintiff until the paramedics arrived.  Mr. Walter did not speak with any USPS investigator.

At trial, Mr. Walter drew a diagram of the position of the vehicles after the accident.  [PX #53].  He stated that the mail truck had all westbound lanes of 1st Avenue North blocked, but none of the truck was in the turn lane or in 45th Place North.  He also stated that he saw plaintiff for the first time since the accident about two to three months prior to his deposition.  He further testified that they spoke only briefly and did not discuss details of the accident.  Plaintiff testified at trial that he saw Mr. Walter about three months after the accident at the mall or a store, but they only talked briefly because Mr. Walter was working.

Just after the crash, Ronald Johnson exited his truck and walked around to determine what had hit the truck.  He then saw plaintiff's car wedged under the left passenger side of the truck.  He saw plaintiff on the ground and asked if he was OK; plaintiff said he was not.  Mr. Johnson called 911 and also called the post office to report the accident.  Mr. Johnson observed Mr. Harris and Mr. Walter assisting plaintiff.  Mr. Walter borrowed Mr. Johnson's cell phone to call plaintiff's family, at plaintiff's request.

According to the accident report prepared for the incident [DX #30], the Birmingham Police Department received a call about the accident at 10:18 p.m.

11

on January 22, 1999. Officer L. Taylor (now Edwards) and another officer arrived on the scene at 10:23 p.m., according to the accident report. She has worked for the Birmingham Police Department since June 1995 and has received some training in accident investigation. However, she has not received any special training in that subject. She has no independent recollection of her investigation of the accident and relied entirely on her report in testifying. The diagram on the report of the scene shows three lanes of traffic for 1st Avenue North rather than five. Officer Edwards spoke with Mr. Walter, Mr. Harris and Mr. Johnson in preparing the report. She did not speak with plaintiff. She did not recall being told by Ronald Johnson that plaintiff was driving too fast or was driving with his lights off. She testified that she did not recall observing any beer cans in plaintiff's car or on the road, did not recall any smell of alcohol from plaintiff or his car, and did not recall being advised by Mr. Johnson that he saw beer cans in plaintiff's car. She also did not recall if anyone asked her to look in plaintiff's car. She testified that if someone had mentioned alcohol in plaintiff's car or had she looked in plaintiff's car and seen beer cans, she would have noted it on her report. She testified that a smell of alcohol on a person's breath can come from consumption of alcohol or from diabetes.

Officer Edwards testified that she made measurements at the scene to prepare the drawing on the report. According to her diagram, none of Mr.

12

Johnson's truck was in 45th Place North; it was all on 1st Avenue North, about four paces from the curb at 45th Place North. The rear of the truck was in the turn lane, and the front part blocked two of the lanes of 1st Avenue North. Her report did not show any skid marks. She also stated there is no traffic signal at the intersection of 1st Avenue North and 45th Place North. She estimated Mr. Johnson's speed as 5 m.p.h., but plaintiff's speed was said to be "unknown." Officer Edwards said she would not have put down an estimated speed for plaintiff, even if she had thought he was speeding. The report shows a code for "unknown" as to plaintiff's contributing circumstances. Based on her observations and the statements she obtained, she made a determination that the accident was caused by Ronald Johnson's failure to yield the right of way to plaintiff. That determination was based only on Ronald Johnson's statement that he turned left and was hit by plaintiff. She had no knowledge about plaintiff's speed or whether his headlights were on, and it would have made a difference in her determination as to fault if plaintiff had been speeding, driving under the influence of alcohol, or driving with his headlights off. She also testified it would have made a difference had she known of plaintiff's statement that he was concentrating on the green traffic light at the intersection just before the wreck.

Mr. Johnson testified that after speaking with Mr. Walter and Mr. Harris and observing the vehicles, Officer Edwards spoke with him in the patrol car.

13

He further testified that he told Officer Edwards he saw/smelled beer and asked her to investigate further.  However, Officer Edwards refused to do so.  She also told him just because there was a smell of alcohol did not mean a person was driving under the influence.  Officer Edwards' report indicates her opinion that the accident was caused by Mr. Johnson's failure to yield the right-of-way to plaintiff.  Under contributing factors, no mention is made of speeding, driving under the influence or failure to use headlights.

Two emergency medical technicians arrived on the scene shortly after the accident.  According to the police report, they arrived at 10:16 p.m.  EMT James Christopher Slaughter testified at trial; however, he had no independent recollection of the incident and relied solely on his report in testifying.  [PX #24 and DX #31].  Mr. Slaughter had received his EMT certification approximately six months prior to the accident, after two years of courses.  He was trained to check for elevated blood sugar, if the patient seemed to have diabetes or to be confused or disoriented.  He also was trained to ask patients if they had consumed alcohol or drugs, to be able to correctly advise any treating physician.  According to his report, when he and his partner, EMT Jones, arrived on the scene, they observed plaintiff in the street.  He was placed on a backboard and told them his head and right hip hurt.  Plaintiff advised the EMTs that he had had one beer.  Mr. Slaughter testified that it is common when an accident victim is asked whether he was drinking, he will say he had only one

14

or two drinks, to explain any smell of alcohol.  While Mr. Slaughter did not specifically state in his report "smell of ethanol," he stated that he does not always put this in his patient care report.  The paramedics transported plaintiff to Carraway Methodist Hospital for treatment.  While plaintiff testified that during transportation to the hospital, he was "in and out of consciousness," that testimony was inconsistent with Mr. Slaughter's observations.  He would have placed a notation to that effect in the patient care report had he noted that plaintiff was disoriented or lost consciousness on the way to the hospital.  Plaintiff testified that he was able to communicate with the paramedics at the scene and in the ambulance.

The records from Carraway Hospital indicate plaintiff arrived at 10:45 p.m.  [See PX #18 and DX #32, plaintiff's records from Carraway Hospital and treating physician Dr. John Compton].  Blood was drawn from plaintiff at 11:30 p.m., and the blood was tested for the presence of alcohol.  The test shows that plaintiff's blood alcohol content at that time was 83 mg/dl, which is equivalent to .083.  [DX #45].  In the State of Alabama, a person with a blood alcohol content of .08 or more is considered to be driving under the influence.  § 32-5A-191(a)(1), Code of Alabama.  Plaintiff sustained an abrasion to his forehead and a closed fracture of his right femur.  The rod and plate in the right leg also were broken.  Plaintiff was in the hospital for two days before the operation to fix his fractures.  When plaintiff was operated on to repair his injuries, doctors

15

discovered a pre-existing infection at the site of the previous surgery. The infection eventually would have caused bone loss or possibly loss of the right leg, had it not been discovered. Doctors repaired the leg fracture, placing a rod in the bone and a plate to hold it together. To allow for intravenous antibiotics, a catheter was placed in plaintiff's chest. While in the hospital, based on his report to his treating physicians about his daily alcohol consumption of an average of 12 to 24 beers a day, plaintiff was given two beers twice a day so that he would not experience alcohol withdrawal symptoms.

Plaintiff was discharged from the hospital on February 1, 1999. He went home and was on bed rest for approximately six months while recovering. He used a walker, but doctors encouraged him to exercise and get out of bed to avoid bed sores. He also took physical therapy. Plaintiff received antibiotics to heal the infection, and he also received pain medication. Plaintiff applied for and received Social Security disability and states he is now unable to work or play basketball. Plaintiff was on pain medication before the accident, as needed, based on his injury from the 1980s. He still takes pain medication from time to time whenever he experiences pain in his leg or hip, usually when the weather changes. Plaintiff uses a cane to assist in walking, as he did from time to time before the accident.

On May 23, 2002, plaintiff was convicted in the Circuit Court of Jefferson County based on a plea of guilty for obstruction of justice based on giving false

16

information to a police officer.  He was sentenced to serve 11 years and placed on probation.  [DX #49].  Plaintiff had not advised his trial attorney of the conviction prior to trial.

Arthur Hill has been an employee of the USPS for 33 years and has been a Manager of Distribution Operations (MDO) for 16 years.  He works the 3 p.m. to 11:30 p.m. shift.  As an MDO, he has some responsibility for accident investigation, but he does not have any special training.  On January 22, 1999, Mr. Hill received a call that a USPS vehicle had been involved in a wreck.  As Mr. Hill and Curtis Johnson came down 1st Avenue North, they passed by the vehicles and made a left turn onto 45th Place North to park.  The entrance to 45th Place North was partially blocked.  Because plaintiff already had been taken from the scene by paramedics, Mr. Hill never spoke with him.  Mr. Hill did speak with Ronald Johnson, who advised that he was making a left turn onto 45th Place North from 1st Avenue North when a car "came out of nowhere" and hit him.  Mr. Johnson reported that the car was speeding and did not have its headlights on, but he also said he did not see the car before it hit him.

Mr. Hill examined the area for skid marks but did not see any.  Because he did not have a camera, or there was no film in the camera, he drew a freehand diagram of the location of the vehicles at the intersection.  [PX #3]. He did not take any measurements.  Mr. Hill also spoke with the police and briefly with Willie Harris, but he did not take a statement from Anthony Walter.

17

Mr. Hill saw that the headlights and left turn signal on the USPS truck were on. Plaintiff's headlights and taillights were not on; however, the dome light inside his vehicle was on. Mr. Hill looked in plaintiff's car and smelled alcohol. He also testified that he observed beer cans and a whiskey bottle. He asked Curtis Johnson to smell in plaintiff's car, too. Mr. Hill reported the smell to police and asked them to look in plaintiff's car; however, he testified that they told him they did not do that as part of their investigation. Mr. Hill turned over his notes to Roland Fleming when Mr. Fleming arrived on the scene.

Curtis Johnson is employed as a Manager of Distribution Operations with the USPS. He has been a USPS employee since 1975. Inasmuch as he had just been promoted to that position in January 1999 and never had investigated an accident before, he accompanied Arthur Hill to the scene of the wreck between plaintiff and Ronald Johnson. When they arrived, Mr. Johnson saw Ronald Johnson's USPS truck at and angle to the intersection of 1st Avenue North and 45th Place North, as if it had been making a turn. When he walked around the truck, he saw plaintiff's car wedged under the truck about the middle of the cargo portion. Mr. Johnson did not notice or recall whether plaintiff's or Ronald Johnson's headlights were on. By the time Curtis Johnson arrived, plaintiff had been taken to the hospital by paramedics. Mr. Johnson and Mr. Hill looked for skid marks but did see any, due to the rain and some standing water on the road. Mr. Johnson smelled the inside of plaintiff's car, at Mr. Hill's request, and

18

he also smelled alcohol.  Mr.  Johnson testified at his deposition that when he looked in plaintiff's car, he saw three or four beer cans in the back seat area of plaintiff's car. [DX #47].  However, at trial, he could not recall his deposition testimony.  He also stated he had a stroke about two years before the trial and about one year before his deposition that could have clouded his recollection.

Roland Fleming, employed by the USPS since November 22, 1984, has been a Manager in Motor Vehicle Services for approximately eight years.  His duties include dispatching trucks, ensuring compliance with time schedules, and investigating accidents involving USPS vehicles.  When reporting to an accident scene, he usually takes a special kit and camera, determines the condition of the USPS driver, secures the mail in the USPS vehicle, and assists the police as requested or needed.  He is trained to listen to witnesses as they talk to police, take photographs and measurements, find skid marks, and mark the vehicles' location with chalk.  However, he does not interfere with the police in their investigation.  In January 1999, he was the supervisor for the 1 p.m. to 10 p.m. shift.

On the night of January 22, 1999, he was paged at home about the accident.  He proceeded to the scene of the accident.  Because he had not been in his office, he did not have the USPS accident investigation kit or camera with him.  By the time Mr. Fleming arrived at the site, plaintiff's vehicle had been towed away; therefore, he was unable to observe the damage done to plaintiff's

19

vehicle or its location just after the accident before preparing his report for the USPS. He observed that the rear axle of the mail truck was broken and saw debris in the turn lane and Birmingham-bound lanes of 1st Avenue North, including broken bolts and a leaf spring. [See PX #7 and DX #26, 27 and 28 for photographs of defendant's truck after collision; see DX #43 for description of repairs to defendant's truck after collision]. Mr. Fleming was unable to do a normal investigation at that time because it was pouring rain, there was standing water in the street, plaintiff's car had been removed, and he did not have his accident kit with him. He could not check for skid marks nor make any chalk marks due to the rain.

Mr. Fleming prepared his reports and a diagram of the accident site and the vehicles' locations based on the police report, the location of defendant's truck, and the information received from Ronald Johnson. [PX #2, 9, 10, 11, 12]. Before going back out to the scene in better weather, Mr. Fleming also spoke with Arthur Hill and Curtis Johnson, who reported the strong smell of alcohol in plaintiff's car. Mr. Fleming also recalled that Ronald Johnson mentioned the smell of alcohol to him but did not say anything about seeing beer cans or asking the police to look in plaintiff's car. After his brief investigation, Mr. Fleming concluded that the cause of the accident was that the USPS driver turned into the right of way of the oncoming vehicle, with contributing factors of possible drinking, speeding and failure to use headlights

20

on plaintiff's part. He testified at trial that after hearing the testimony of other witnesses, seeing the hospital toxicology report, and seeing the photographs of plaintiff's vehicle, he would revise his opinion. Instead of placing fault on Ronald Johnson for failure to yield the right of way, he would have determined that plaintiff was at fault for speeding and driving under the influence.

Mr. Fleming also testified about a photograph he took of the USPS truck. [PX #7]. He opined that plaintiff's car hit the truck at an angle, meaning the truck already was in a turn when it was hit. He stated in deposition that his drawing of the location of the truck was based on its location when he arrived on the scene, after plaintiff's car had been removed. He concluded that Ronald Johnson did not see plaintiff's car prior to the collision and that the area was poorly lighted because there was only one streetlight several feet away from the intersection. Because there were no skid marks available to measure at the site, Mr. Fleming normally would have conducted a crush test to estimate the speed of the vehicles. However, he was unable to do so because plaintiff's car had been taken from the site by the time he arrived. However, based on the condition of the USPS truck, he determined that the extent of damage was caused by a significant impact. At trial, after being provided with additional evidence about plaintiff's lack of headlights, the damage to plaintiff's car as shown in photographs, and the blood alcohol test on plaintiff, Mr. Fleming testified that he would not have recommended payment of plaintiff's claim.

21

Instead, he would have stated that there were other outstanding causes of the accident, specifically, plaintiff's high speed, alcohol consumption and asserted concentration on a non-existent traffic signal; therefore, he would have recommended that plaintiff's claim not be paid. Mr. Fleming further testified that based on his years of driving experience, the maximum safe driving speed under the conditions present on the night of January 22, 1999, would have been 20 m.p.h.

## CONCLUSION

After consideration of the testimony at trial and the exhibits submitted by the parties, the Court finds that the damage to plaintiff's car [see PX #36 through 40 and DX #41] and defendant's truck, is consistent with a collision at a higher rate of speed than 25 m.p.h. Further, the fact that the mail truck driven by Mr. Johnson was pushed back from the entrance to 45th Place North to 1st Avenue North, along with the presence of debris in the road such as leaf springs and broken bolts, also is consistent with a speed of greater than 25 m.p.h. with regard to plaintiff's car.

The Court credits the testimony of Ronald Johnson and Willie Harris that Ronald Johnson's headlights were on at the time of the accident. The Court also finds implausible plaintiff's testimony that he had his headlights on, that he was not going too fast for the weather and lighting conditions, and that he

22

had not consumed alcohol at the time of the accident.  Plaintiff's testimony and that of Anthony Walter on these subjects are unworthy of belief for several reasons.

First, the blood test administered at the hospital after the accident showed plaintiff's blood alcohol level to be greater than the legal limit, and plaintiff admitted to EMTs that he had consumed at least one beer.  Second, the extent of damage to plaintiff's vehicle is not consistent with a speed of only 20 to 25 m.p.h.  Third, plaintiff has two felony convictions, one of which involves lying to police.  Fourth, in plaintiff's application for Social Security disability benefits, he attests he had not received any income from employment for many years, despite his testimony at trial that he was working as a lumper during that time period, making $500 to $600 a week.  Fifth, Mr. Walter and plaintiff both testified at length and in great detail about a traffic signal at the intersection which does not even exist, lending credence to the conclusion that they coordinated their stories about the accident.

Plaintiff alleges that Ronald Johnson negligently or wantonly caused the collision that is the subject of this lawsuit by failing to have his headlights or turn signal on and by failing to yield the right of way to plaintiff.  Negligence is defined as the existence of a duty by the defendant to the plaintiff to exercise due and reasonable care, and a breach of that duty which proximately causes damage to the plaintiff. *Thompson v. Lee*, 439 So.2d 113, 115 (Ala. 1983);

23

*Cooper v. Agee*, 222 Ala. 334, 132 So. 173 (1931). Mere proof that an accident and an injury occurred is generally insufficient to establish negligence. *Thompson, supra; Mobile Press Register, Inc. v. Padgett*, 285 Ala. 463, 233 So.2d 472 (1970). Wantonness is defined as reckless indifference to consequences and consciously and intentionally doing some wrongful act or omitting some duty which produces injury. *Zemczonek v. McElroy*, 86 So.2d 824 (Ala. 1956).

Defendant contends that plaintiff was contributorily negligent, and that such negligence proximately caused or contributed to the accident. Contributory negligence on the part of a plaintiff which proximately contributes to plaintiff's injuries will bar recovery. *Creel v. Brown*, 508 So.2d 684 (Ala. 1987). Defendant alleges plaintiff was contributorily negligent because he did not have his headlights on, because he was driving too fast for the weather and lighting conditions at the time of the accident, and because he was driving under the influence of alcohol. In *Tyus v. Reynolds*, 794 So.2d 1189 (Ala.Civ.App. 2001), the court found that a motorist driving at night in the rain was contributorily negligent in not having his headlights on. Driving under the influence is negligence as a matter of law, but that negligence still must have proximately contributed to the accident to bar recovery. *See Hallman v. Summerville*, 495 So.2d 626 (Ala. 1986).

Alabama law requires a motorist to have his lights on from a half hour after sunset to a half hour before sunrise and at any time when there is not sufficient light to render clearly discernible persons and vehicles on the highway at a distance of 500 feet. § 35-5-240(a)(1), *Alabama Code* (1975). Alabama law also provides that a vehicle making a left turn must yield the right-of-way to any vehicle approaching from the opposite direction which is within the intersection or so close thereto as to constitute an immediate hazard. § 32-5A-111, *Alabama Code* (1975). A collision in such circumstances is *prima facie* evidence of failure to yield. § 32-5A-112, *Alabama Code* (1975).

Section 32-5A-170, *Alabama Code* (1975), provides, "No person shall drive a vehicle at a speed greater than is reasonable and prudent under the conditions and having regard to the actual and potential hazards then existing." Alabama law further provides in § 32-5A-191(a), *Alabama Code*, that "A person shall not drive or be in actual physical control of any vehicle while:  (1) There is 0.08 percent or more by weight of alcohol in his or her blood; (2) Under the influence of alcohol;  . . . ."

The Court finds that plaintiff was going faster than was reasonable and prudent under the weather and lighting circumstances. The court also finds that plaintiff was operating his vehicle under the influence of alcohol and had consumed sufficient alcohol by the time of the accident that his blood alcohol content exceeded the legal limit and impaired his ability to drive safely and

25

react in a normal manner.  Further, even if Johnson acted unreasonably and negligently in turning in front of plaintiff, such that he failed to yield the right of way to plaintiff, plaintiff's own actions proximately caused and contributed to the accident.  In this case, the court finds that Ronald Johnson had his headlights on, had reflective decals on his vehicle, and was stopped under a streetlight and, therefore, should have been visible to plaintiff had plaintiff been exercising due care.  Plaintiff's contributory negligence bars any recovery in this action.

Based on the foregoing, the court finds that defendant is entitled to the entry of judgment with respect to any and all claims asserted by plaintiff in this action, and that this action is due to be dismissed with prejudice.  A separate order in conformity with this Memorandum Opinion will be entered contemporaneously herewith.

**DONE** this _____ 27th _____ day of September, 2002.

HARWELL G. DAVIS, III
UNITED STATES MAGISTRATE JUDGE

26